1

2

3

Gail K. Johnson, *admitted pro hac vice*
Colorado State Bar No. 29703
Aurora L. Randolph, *admitted pro hac vice*
Colorado State Bar No. 51300
JOHNSON & KLEIN, PLLC
1470 Walnut Street, Suite 101
Boulder, Colorado 80302
gjohnson@johnsonklein.com
arandolph@johnsonklein.com
Phone: (303) 444-1885
Fax: (866) 340-8286

Attorneys for Plaintiffs Estate of
Clinton Dewayne Smith, and Sabrina Smith

4

5

6

7

8

9

10

11

12

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| Estate of Clinton Dewayne Smith; and Sabrina Smith, as personal representative of the Estate and in her personal capacity,<br><br>            Plaintiffs,<br>v.<br><br>John T. Shartle, in his personal capacity; Susan G. McClintock, in her personal capacity; John Doe 1, in his personal capacity; John Doe 2, in his personal capacity; John Doe 3, in his personal capacity; John Doe 4, in his personal capacity; John Doe 5, in his personal capacity; John Doe 6, in his personal capacity; John Doe 7, in his personal capacity,<br><br>            Defendants. | Case No. _____<br><br><br>**COMPLAINT AND JURY DEMAND**<br><br><br><br>DATED this 2nd day of July, 2018.<br><br><br>    s/ *Gail K. Johnson*<br>      Gail K. Johnson<br>   Attorney for Plaintiffs |

COME NOW, the Estate of Clinton Dewayne Smith (the Estate) and Sabrina Smith, as personal representative of the Estate and in her personal capacity, by and through their attorneys of record, and allege as follows:

## INTRODUCTION

1. Clinton Dewayne Smith was strangled to death by his cellmate while the two were locked in a segregation cell within the Special Housing Unit (SHU) at the United States Penitentiary in Tucson, Arizona (USP-Tucson).  He was targeted because he was convicted of a sex-related offense.

2. It is widely known among prison officials, officers, and staff that sex offenders are the pariahs of prison culture.  They are viewed as the "lowest of the low."  As a result, sex offenders are often targets for exploitation, violence, and extrajudicial killing.

3. Sex offenders make up less than 10% of the Bureau of Prisons (BOP) prisoner population but are the victims of a disproportionate number of inmate-on-inmate homicides.  At USP-Tucson alone, there were at least five prisoner-on-prisoner homicides in the six years leading up to Mr. Smith's murder.  Most of the victims were sex offenders or believed by their perpetrators to be sex offenders.

4. Defendants are experienced corrections officials.  They know that sex offenders face an obvious and substantial risk of harm from other federal prisoners on a daily basis.  Yet, in the months preceding Mr. Smith's murder, they took no steps to render USP-

Tucson safer for sex offenders.  They continued to house sex offenders with other prisoners who wished to harm them.  And sex offenders continued to be brutally assaulted and killed.

5. Tragically, Mr. Smith was no exception to this culture of violence.

6. When Mr. Smith arrived in the SHU on July 4, 2016, Defendants had to find a cell in which to put him.  They asked Romeo Giovanni—reputed among prisoners to be a member of or associated with an Aryan Brotherhood group—if he would "accept" Mr. Smith in his cell.

7. Mr. Giovanni's hatred for sex offenders was widely known.  In the months preceding Mr. Smith's murder, he spoke openly throughout the prison about his views and about his prior acts of violence on cellmates.  Shortly before Mr. Smith was forced into this cell, Mr. Giovanni insisted that he would not accept being housed with a different sex offender.  The Defendants working in the SHU at the time accordingly refrained from housing that prisoner with Mr. Giovanni.

8. When Defendants responsible for placing Mr. Smith in a cell in the SHU approached Mr. Giovanni's cell and asked whether he would accept Mr. Smith—a sex offender—as his cellmate, Mr. Giovanni refused and told them, again, that if they forced him to cell with Mr. Smith, a sex offender, he would kill him.

9. This time, these Defendants ignored Mr. Giovanni's unambiguous message and placed Mr. Smith into the small, locked cell with Mr. Giovanni.

10. The next morning, Mr. Smith was dead.  And Mr. Giovanni was heard boasting about the kill and yelling that he had told BOP officers he would kill Mr. Smith if they placed him in Mr. Giovanni's cell.

## JURISDICTION AND VENUE

11. This action arises under the Constitution and laws of the United States.  This Court possesses subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4).

12. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## PARTIES

**Plaintiffs**

13. Plaintiff the Estate of Clinton Dewayne Smith is a party in interest following the death of Clinton Dewayne Smith, who was killed while in the custody of the BOP on or about July 5, 2016.  At all times pertinent to this Complaint, Mr. Smith was a citizen of the United States and a resident of the State of Louisiana who was imprisoned in USP-Tucson.  The Estate appears through its duly-appointed personal representative, Sabrina Smith.

14. Plaintiff Sabrina Smith was Mr. Smith's wife of nearly seventeen years, and she is the mother of their three children.  At all times pertinent to this Complaint, she was a citizen

1    of the United States and a resident of the State of Louisiana.

2    **Defendants**

3    15. Defendant John T. Shartle, at all times pertinent to this Complaint, was a citizen of the

4    United States and a resident of the State of Arizona.  At all times relevant, he was acting

5    under color of federal law as an employee of the BOP.  Upon information and belief, at

6    all times relevant to this Complaint, Defendant Shartle was the Warden of the BOP

7    Federal Correctional Complex in Tucson, which includes USP-Tucson.

8    16. Defendant Susan G. McClintock, at all times pertinent to this Complaint, was a citizen

9    of the United States and a resident of the State of Arizona.  At all times relevant, she

10   was acting under color of federal law as an employee of the BOP.  Upon information

11   and belief, at all times relevant to this Complaint, Defendant McClintock was the

12   Warden of USP-Tucson.

13   17. Defendant John Doe 1, at all times pertinent to this Complaint, was a citizen of the

14   United States and a resident of the State of Arizona.  At all times relevant, he was acting

15   under color of federal law as an employee of the BOP and, specifically, the Associate

16   Warden of Custody at USP-Tucson. John Doe 1 will be referred to herein as "AW of

17   Custody."

18   18. Defendant John Doe 2, at all times pertinent to this Complaint, was a citizen of the

19   United States and a resident of the State of Arizona.  At all times relevant, he was acting

20   under color of federal law as an employee of the BOP and, specifically, a Captain at

21

USP-Tucson.  John Doe 2 will be referred to herein as "Captain."

19. Defendant John Doe 3, at all times pertinent to this Complaint, was a citizen of the United States and a resident of the State of Arizona.  At all times relevant, he was acting under color of federal law as an employee of the BOP and, specifically, the Lieutenant for the SHU at USP-Tucson.  John Doe 3 will be referred to herein as "SHU Lieutenant."

20. Defendant John Doe 4, at all times pertinent to this Complaint, was a citizen of the United States and a resident of the State of Arizona.  At all times relevant, he was acting under color of federal law as an employee of the BOP and, specifically, the Manager of the SHU at USP Tucson.  John Doe 4 will be referred to herein as "SHU Manager."

21. Defendant John Doe 5, at all times pertinent to this Complaint, was a citizen of the United States and a resident of the State of Arizona.  At all times relevant, he was acting under color of federal law as an employee of the BOP and, specifically, a correctional officer working in the SHU at USP-Tucson.

22. Defendant John Doe 6, at all times pertinent to this Complaint, was a citizen of the United States and a resident of the State of Arizona.  At all times relevant, he was acting under color of federal law as an employee of the BOP and, specifically, a correctional officer working in the SHU at USP-Tucson.

23. Defendant John Doe 7, at all times pertinent to this Complaint, was a citizen of the United States and a resident of the State of Arizona.  At all times relevant, he was acting

under color of federal law as an employee of the BOP and, specifically, a correctional officer working in the SHU at USP-Tucson.

24. John Does 5, 6, and 7 will be referred to herein as "SHU Officers."

25. Plaintiffs attempted to obtain information that would lead to the discovery of the identity of the John Doe Defendants prior to filing this Complaint and Jury Demand. Mrs. Smith, as the widow of a murdered prisoner, first asked the BOP for records concerning the death of her husband. This was denied. Mrs. Smith then requested relevant records via the Freedom of Information Act. The BOP responded, stating that it would cost nearly $12,000 to fulfill the request. Mrs. Smith appealed the stated fee and offered to narrow the categories of requested documents. In response, the BOP refused to provide any documents, stating "records are not releasable to you at this time."

26. Plaintiffs' counsel also conducted extensive fact investigation to ascertain the identities of the John Doe Defendants. However, the parties to whom Plaintiffs' counsel has access are prisoner-witnesses, who often do not know or recall correctional officers' names. This is because either officers deliberately obstruct nametags and other identifying information or prisoners fail to remember names of the many correctional officers they interact with after such interactions have taken place.

27. Upon information and belief, however, the following names are the likely identities of some or all of the John Doe Defendants: Corrections Officers Islas, Ceniceros,

1    Goodman, Dunham, Yanez, Kurtz, Klinger, Montano, Ulbricht, Franco, and Beans;

2    Unit Counselor Santa Cruz; Operations Lieutenant Domitrovich; Lieutenant Logan;

3    Unit Manager Bacon; Discipline Hearing Officer Secretary Mack; Dr. Benach; and Dr.

4    Ivy.

5    ### FACTUAL ALLEGATIONS

6    **Mr. Smith's Life as a Husband and Father.**

7    28. Clinton Dewayne Smith, the eldest of four, met Sabrina in October 1998.  She worked

8    at a local grocery store where Mr. Smith cashed his checks.

9    29. They fell in love with each other quickly and were engaged just three months after

10    their first date.  Mr. Smith asked Sabrina's father for her hand before he proposed.

11    30. The two married on October 16, 1999, at Saint Amant Baptist Church near their

12    hometown—the same church where Mr. Smith would be buried nearly seventeen

13    years later.

 

*Clinton and Sabrina Smith at their wedding.*

21    31. Religion was a big part of Mr. Smith's life, even before he met Mrs. Smith.  He served

as an usher at his church and performed in the church choir.  He could be seen frequently with his Bible under his arm.

32. Mr. Smith also loved to read, write, watch movies, bowl, crochet, and play video games.

33. Four years into their marriage, the Smiths were overjoyed to find out that Mrs. Smith was pregnant.  This was her first child.  For Mr. Smith, it would be his first daughter but second child, as he had a son from a previous marriage.

34. Shortly after their daughter was born, Mrs. Smith again became pregnant, this time with twin boys.  Their sons arrived soon thereafter, surprising the couple five weeks before they were due.

35. Mr. Smith was very proud of his children.  As a long-haul truck driver, he spent long periods of time away from home, but he paid particular care to ensuring he maintained a strong relationship with each of his kids.  He called home often to tell his children where in the country he was and what he was doing.  When there was extra money, he bought small gifts to surprise Mrs. Smith and the children when he got home.



*Mr. Smith and his three children.*

36. Parenting was not easy for the Smiths.  When their children were young, two of them began showing symptoms of a rare chromosomal disorder.  Mr. Smith's daughter and one of his sons are physically disabled and nonverbal.  They require constant support and care.

37. Mr. and Mrs. Smith had a strong marriage.  They did nearly everything together, from bowling to video games to working together at a few places before Mr. Smith became a trucker, and they worked to create a strong extended family.  Even though money was tight, the Smiths made it a point to travel together to visit each other's aging parents.

38. Mr. Smith had a sense of humor.  He poked fun of Mrs. Smith for her Virginia accent.

39. Underneath the teasing, though, Mr. Smith taught Mrs. Smith how to believe in and stand up for herself.  He gave her a "backbone."  Mr. Smith's love for his wife gave her the confidence and strength to fight for what she knew was right.

40. Mrs. Smith was not religious before meeting her husband.  Indeed, she credits Mr. Smith with bringing faith to her life.  He "saved" her.

41. In reality, they saved each other.  They loved each other unconditionally, through and in spite of their respective mistakes and flaws.  The Smiths were soulmates.

**Mr. Smith's Prosecution and Court-imposed Punishment.**

42. In 2013, the federal government charged Mr. Smith with two counts relating to child pornography.

43. While his criminal case was pending, Mr. Smith was incarcerated at the Ascension

Parish Jail near the Smiths' home in Louisiana.  Although it was forty-five minutes away from their home, Mrs. Smith visited her husband in the jail as often as she could, at least once every week or two.  More often than not, Mrs. Smith would load all three children up in the van with her and they would make the trip to see Mr. Smith as a family.

44. Mr. Smith pleaded guilty to both counts.  He was sentenced to serve 480 months in the custody of the BOP, followed by ten years of supervised release.

**In Prison, Mr. Smith Strove to Better Himself, and Embody Faith and Humility.**

45. The sentencing judge recommended that the BOP designate Mr. Smith to a prison that was capable of providing sex-offender treatment.  The BOP designated Mr. Smith to USP-Tucson.

46. Mr. Smith arrived at USP-Tucson from another BOP institution in Louisiana where he had been housed pending sentencing.  At that facility, four men attacked Mr. Smith in the middle of the night.  They knocked him unconscious and broke his nose and arm.  Upon information and belief, the men targeted Mr. Smith because of his status as a sex offender.

47. The BOP moved him to USP-Tucson after the attack, where he arrived with bruises on his face and his arm in a sling.  Mr. Smith was in such a bad state after his attack that he had to wait to heal before he could even be transported to USP-Tucson.

48. Sometime into his incarceration at USP-Tucson, Mr. Smith joined the Challenge

Program.  According to the BOP, the Challenge Program is a cognitive-behavioral, residential treatment program developed for and available to men in most United States Penitentiaries.  The Challenge Program provides treatment to prisoners with, among other things, mental illnesses.

49. Programming is delivered through a therapeutic-community environment.  Prisoners participate in interactive groups and attend community meetings.

50. To be eligible for the Challenge Program, a prisoner must be free from disciplinary incidents for one year.

51. At USP-Tucson, prisoners participating in the Challenge Program live together in the same incentive housing unit.  Because they are in an incentive unit, prisoners in the Challenge Program receive more privileges and freedoms than those in other general population units, including access to certain recreation equipment and the unit's own library.

52. A primary component of the Challenge Program at USP-Tucson while Mr. Smith was there was the "AM Meeting" or "Morning Meeting."  The unit—prisoners and staff—gathered at these meetings to discuss any issues or disagreements prisoners were having with each other.

53. These meetings were supposed to be a safe and supportive environment for participants to develop skills to communicate openly and effectively with each other.

54. Mr. Smith took full advantage of his opportunity in the Challenge Program.  He

attended the meetings regularly and was an eager listener and participant.

55. Committed to bettering himself and learning methods to improve his relationships, he also invested himself wholeheartedly in the therapy portion of the program.  Mr. Smith was sincere in his efforts to correct the mistakes he had made in his life.

56. Not only did Mr. Smith earnestly participate in the Challenge Program, he kept his focus on his faith.  He regularly attended church at USP-Tucson, where he served as a chapel monitor, and was often seen studying his Bible.

57. A fan of country music, Mr. Smith loved to sing.  Although some of his friends in his unit and those who attended church would admit he did not have much talent, Mr. Smith sang with heart.

58. Mr. Smith missed his family deeply when he went to prison, and being shipped to a facility well over 1,000 miles from his home was difficult for the Smith family.

59. Money was a scarce resource for the family, so visiting Mr. Smith at USP-Tucson was an enormous hardship for Mrs. Smith.  In addition to paying for the travel, Mrs. Smith had to find someone capable of taking care of the children while she was away and had to take days off of work.

60. Despite the massive challenges, she scraped together enough money to visit her husband in May 2015.  She spent months preparing for the trip: getting work off, making arrangements with the BOP to have her visit approved, coordinating care takers for the children, and making travel plans for the 1,300-mile trip.

61. Mrs. Smith flew to Tucson on a Friday evening and visited her husband in the prison the entire day on both Saturday and Sunday in May 2015.  They were permitted to hug and kiss each other when she arrived and when she left, but they were not allowed to hold hands during the visit.  During what would be their last hours together, the couple tenderly touched feet as they soaked up the moments together.

62. While the couple welcomed the visit and the time they spent together, saying goodbye was hard.  Mrs. Smith tried to be strong, but she could not hold back the tears.  She hugged and kissed Mr. Smith, and promised to visit again as soon as she could save the money to pay for another trip.



*Mr. and Mrs. Smith in the USP-Tucson visiting room in May 2015.*

63. While Mrs. Smith could not afford to purchase tickets for her children to visit their father in USP-Tucson, Mr. Smith often wrote to his children, encouraging his sons to "stay strong" and keep reading and studying their Bibles.

64. Mr. Smith also wrote frequently to Mrs. Smith, jotting notes to her almost every day and then sending the pages in batches, usually weekly.  His letters, which begin with phrases such as "my lovely wife" and "dear," demonstrate his love for her and the connection the two shared.  His notes often were accounts of his daily life in prison, telling Mrs. Smith what he ate for dinner and how he had passed his time that week— such as which card games he played and whether he won—showing how the couple diligently took care to remain close to each other even though they were over 1,000 miles apart.

65. In prison, Mr. Smith loved to play chess, though he was not particularly good at the game.  A friend and former cellmate tried to teach Mr. Smith how to improve his chess skills. Despite Mr. Smith's best efforts, his chess game did not improve much. Nonetheless, he did not give up.  He continued to practice and challenge his friend in chess tournaments.

66. In addition to his other activities at USP-Tucson, Mr. Smith crocheted items of clothing, such as winter hats and scarves, to donate to those in need and to send to his family.

67. He wrote poetry, expressing the pain he experienced being separated from his family and the lasting love he felt for Mrs. Smith. In one poignant description of the

1    commitment the two shared for each other, Mr. Smith wrote,

2
```
                              Time to move on...
         She has the kids
     They have their needs
         He went to prison
     In a sense so did she
         They cannot be together
     But they cannot live apart
         He has his problems
     But she has more
         Like a broken clock time sits still for him
     But it never stops for her
         While he sits,thinks and writes
     She works long hours, pays the bills and feeds the kids
         They each pray and wonders
```

```
When he will be home
   He says "It's time to move on"
She says "No, Never. I can't, I won't"
   "What about the Kids?"
"Don't worry we will manage."
   It's so hard for him to let go
She will never let go
   Times are hard and rough
But in time they manage to get by
   They each wonder "when will this be over?'
Only time will tell
   When years have gone past
He comes home to an empty nest
   The kids are all grown and gone
But she is still there waiting on him



   Where has time gone?
Who knows.
   But time to move on
Move on to a new, happier and better life.
```

68. The other prisoners in his unit got along well with Mr. Smith.  He was social and outgoing, and he had a pleasant personality.

69. Mr. Smith was a follower, someone who preferred to avoid conflict and keep the peace.

70. It was clear to BOP staff and his fellow prisoners that Mr. Smith had not spent much time in prison.  His arms were free of prison tattoos, and he carried himself in a manner

that suggested he was not adapted to prison lifestyle.  That is, he was not prepared to physically defend himself in the way that other, more seasoned prisoners were.  Mr. Smith was not known to stand up to other prisoners who challenged him.

71. To his fellow prisoners, all of these characteristics of Mr. Smith comprised a dead giveaway that he was a sex offender.

**Incarcerated Sex Offenders Face a Constant and Heightened Risk of Violence.**

72. Prison society is structured around hierarchies—hierarchy among staff, hierarchy between staff and prisoner, and hierarchy among prisoners.  These social pecking orders dictate explicitly and implicitly how life is ordered toward and among the incarcerated.

73. Prisoners are judged, first and foremost, by their fellow prisoners and by staff based on their offense of commitment and any prior prison commitments.  A prisoner's offense dictates whether and to what degree each prisoner is accepted into the prison society.

74. Those convicted of sex-related offenses are a highly stigmatized group within any prison system, including the BOP.  Sex offenders are located at the bottom of the prisoner social hierarchy.  They are considered the pariahs of prison society and thought of as the lowest form of humanity by correctional officers, management, and other prisoners.

75. Prisoners who are not convicted of sex offenses, as well as prison staff, reject sex offenders as undesirable or unfit for the prison community.

76. Individuals convicted of sex crimes involving children, including possession or

1      distribution of child pornography, are further ostracized.  Prison culture regards these

2      prisoners as the lowest of the low.

3   77. As a result of their status as pariahs within the prison community, sex offenders face a

4      heightened risk of violence and exploitation.  This risk of violence ranges from physical

5      threats and intimidation to extortion to serious assault and homicide.

6   78. Sex offenders often lack the physical strength, fighting prowess, and gang affiliation

7      that tend to keep one safe within prison society.

8   79. This makes it easier for certain prisoners to take advantage of and carry out attacks

9      against sex offenders.  They search out and then target those who exhibit no willingness

10     or ability to defend themselves.

11   80. According to a 2013 study by the American Correctional Association—the accrediting

12     body for the correctional industry—more than half of prison wardens agreed that sex

13     offenders are not as safe in prison as those convicted of other crimes.

14   81. Indeed, BOP policy expressly recognizes sex offenders as a vulnerable population

15     within the prison setting.

16   82. In close proximity to sex offenders at the bottom of the prisoner hierarchy are those

17     who have shared information with law enforcement—known as snitches—and those

18     who have dropped out of gangs.

19   83. Often, prisoners fall into both categories: those who have snitched are no longer

20     welcome in their gangs.

21

84. In prison parlance, prisons with active gang activity are known often as "active yards." Prison with less explicit gang activity are known as "inactive yards" or, in the case of USP-Tucson, "sex-offender" yards.

85. Snitches and gang drop-outs are at risk of serious violence if they are housed in prisons with active yards. For this reason, the BOP houses snitches and gang drop-outs in large numbers on inactive yards, like USP-Tucson.

86. Snitches and gang drop-outs are often under pressure or are incentivized to try to "make right" with their former gang. They fear the risks that come from being ostracized from the gang and desire the protection and safety gang affiliation provides in prison.

87. They may also have targets on their backs, through a call from the former gang to take a "hit" out on them. This can mean gang leaders have called for members to carry out anything from a serious assault on the target to his murder.

88. One way to make right with their former gangs, and to avoid falling victim to such a hit, is to target the only group that is more hated in prison than snitches and drop-outs— sex offenders. This is particularly true of gangs devoted to white supremacy, including groups associated with the Aryan Brotherhood.

89. A prisoner who assaults or murders a sex offender in prison is viewed by many of his fellow prisoners as a hero. Often, if the prisoner is a gang drop-out, the action is sufficient to warrant the attacker's renewed membership in his former gang. At minimum, it can remove the target from the attacker's back. At best, the action helps

the attacker ascend again through the gang's ranks and through the social hierarchy of prison culture.

90. Moreover, a prisoner who assaults or murders a sex offender in prison can deflect suspicions that they themselves are a sex offender—and thus at risk of violence.  Hiding one's status as a sex offender by assaulting or killing another sex offender can be a form of self-protection.

91. For the BOP, this risk of violence to sex offenders is far from theoretical or abstract. Male sex offenders comprise less than 10% of the BOP's prisoner population but account for a disproportionately high number of the victims of prison homicides.

92. No BOP prison is immune from this risk of—and actual—violence perpetrated by other prisoners on sex offenders.

93. From April 2005 to June 2014, for example, at the BOP's correctional complex in Victorville, California, Peter Steven Scopazzi, Tony Richard Padilla, David Jones, Robert St. Dennis, Gregory Francis Ritter, Eric Armell, Jr., Michael Paul Jones, Javier Sandez, David Snow, Brian Kountz, and Robert Howard Ferguson were murdered or died as a result of serious assaults perpetrated by fellow prisoners.  Many of these victims were confirmed or suspected sex offenders.  For several of these victims, their perpetrators were repeat offenders of violence against sex offenders.

94. In 2011, Robert A. Warren was attacked on multiple occasions over the span of just months in different BOP prisons by inmates who targeted him because of he was

convicted of sex-related offenses.  One particularly brutal attack by Frederick Ashley, an inmate with whom Mr. Warren was forced to share a Receiving and Discharge holding cell, resulted in Mr. Warren's death.  He was seventy-one years old.

95. In 2014, Ricky Fackrell attacked and killed Ronald Griffith while the two were locked in a recreation cage at the United States Penitentiary in Beaumont, Texas.   Upon information and belief, Mr. Fackrell killed Mr. Griffith because Mr. Griffith was a sex offender.

96. Just one week before Mr. Fackrell killed Mr. Griffith, Mr. Griffith was attacked by another prisoner because he was a sex offender.  At that time, the BOP recommended Mr. Griffith be transferred to a medium-security prison for his own protection.

97. Just months before Mr. Fackrell murdered Mr. Griffith, Mr. Fackrell had stabbed another prisoner to death at the same prison where he killed Mr. Griffith.

**Before Mr. Smith was Murdered, Sex Offenders Were Regularly Attacked and Murdered at USP-Tucson.**

98. Upon information and belief, USP-Tucson began incarcerating sex offenders in large numbers approximately a decade ago.  It is one of just two high-security institutions that offer the BOP's residential sex-offender treatment program.

99. For this reason, USP-Tucson is known widely as a sex-offender yard, one of just a few BOP prisons with this reputation.

100.   In addition to the large number of sex offenders, for the reasons described above,

USP-Tucson incarcerates many gang drop-outs, including former members of Aryan Brotherhood groups and other white supremacist gangs.

101. For the reasons explained above, because of their status as snitches and/or gang drop-outs, these prisoners are unsafe in other prisons, where they would likely be housed with members of their former gang or the gang on whom they had snitched.

102. USP-Tucson's reputation as a sex-offender yard, coupled with the increasing population of gang drop-outs at the prison, combine to heighten the risk of violence for sex offenders even further when compared to other BOP institutions.

103. This is because gang drop-outs fear being associated with the USP-Tucson "sex offender" yard and will take extreme measures to distance themselves from the sex-offender label and re-garner the good faith of their gang so that it is safe for them to re-join an active yard (*i.e.*, transfer to another prison).

104. Additionally, USP-Tucson is one of a small number of high-security BOP prisons equipped to treat prisoners who have chronic or serious medical needs. These prisoners include active gang members who, like the gang drop-outs, seek to harm sex offenders to garner goodwill with gang members or carry out gang directives.

105. The BOP and USP-Tucson, including Defendants Shartle, McClintock, and John Does 1 through 7, did not account for the obvious risk of violence caused by housing sex offenders with gang drop-outs and active gang members who have been steeped in prison gang culture and violence.

106.   Since the BOP began incarcerating gang drop-outs with sex offenders at USP-Tucson, there were at least five inmate-on-inmate homicides at the prison in the six years preceding the murder of Mr. Smith.  The victims were either serving sentences for sex offenses or otherwise believed by other prisoners to have committed sexual offenses.

107.   On November 15, 2010, prisoner Robert Hawpetoss was murdered at USP-Tucson. Mr. Hawpetoss, who was seventy years old at the time, was serving a sentence for sex-related offenses.

108.   Inmate Billy John Smith was convicted in this Court of having strangled Mr. Hawpetoss to death.  The two shared a cell together in the SHU.  Mr. Hawpetoss's body was found on the floor of the cell with torn bed sheets tied around his neck.

109.   Mr. Hawpetoss was survived by his children, step-children, and grandchildren. Billy John Smith is now incarcerated at the United States Penitentiary-Administrative Maximum (ADX) in Florence, Colorado.

110.   On July 15, 2012, inmate Kevin Gray Hutchings was murdered at USP-Tucson.

111.   Inmate Collin James McDonald was charged in this Court with having beaten and kicked Mr. Hutchings to death while the two were locked in a recreation cage together. Upon information and belief, Mr. McDonald targeted Mr. Hutchings because he believed Mr. Hutchings was a sex offender.  Mr. McDonald pleaded guilty to a lesser charge and is now incarcerated at the ADX in Florence, Colorado.

112.   On March 8, 2013, prisoner Marcus Wayne Harrison was murdered by another inmate at USP-Tucson. Mr. Harrison, who was just thirty years old at the time, was serving a sentence for failing to register as a sex offender.

113.   Inmate Dana Louis Mattingly was charged in this Court with having stabbed and strangled Mr. Harrison. Mr. Harrison was found in his cell, laying on the bottom bunk, face up with no clothes on. His wrists and ankles were tied to the four bed posts with shoe strings. He had socks tied around his mouth and a towel wrapped around his neck. He was bleeding from the neck and ribs. Mr. Mattingly's criminal case is pending.

114.   Mr. Harrison was survived by his parents, brother, and sister. Mr. Mattingly is now incarcerated at the United States Penitentiary in Allenwood, Pennsylvania.

115.   On April 21, 2015, prisoner Marshall D. Claffey was murdered at USP-Tucson.

116.   Inmate Carlos Ceja-Castellano was charged in this Court with having strangled Mr. Claffey. Upon information and belief, he targeted Mr. Claffey because he believed Mr. Claffey was a sex offender. Mr. Ceja-Castellano's criminal case is pending.

117.   On December 18, 2015, inmate Michael McCullough was murdered at USP-Tucson. Mr. McCullough was serving time for sex-related offenses. Upon information and belief, Mr. McCullough was intellectually disabled.

118.   Upon information and belief, inmates David Paul Hammer and Morgan Wayne Siler stabbed and strangled Mr. McCullough in his cell and left his body under the bed. Mr. Hammer had previously murdered a cellmate. Mr. Siler had previously murdered a

correctional officer.

119.  Murder is not the only risk to sex offenders at USP-Tucson.  Many are severely beaten and assaulted for no reason other than their status as a sex offender.

120.  For instance, just months before Mr. Smith's murder, a sex offender was attacked in the indoor recreation area at USP-Tucson.  The perpetrator caught the victim by surprise, grabbing his victim by the hair and then kicking and punching him in the head.

121.  In response to the attack, Defendants Shartle, McClintock, and the AW of Custody, instituted a transfer of the victim to the USP-Tucson SHU.

122.  When the victim was taken to the SHU, nearly all of the cells were full.  The only space available for him was in a cell with a gang drop-out.

123.  The SHU Lieutenant, SHU Manager, and corrections officers working in the SHU have authority to move prisoners among cells so that no prisoner is forced to share a cell with someone who poses a risk to his safety.  On occasion, they have asked prisoners whether they would accept sharing a cell with each other.  If the prisoners answered no, it was possible for these Defendants to shuffle cell assignments around to make a suitable alternative available.

124.  But rather than make the necessary moves to cell the victim of the above-mentioned attack with someone who would not pose a threat to him, they celled him with a prisoner who wished to harm him.

125.  For the second time in a matter of days, the victim of the unprovoked assault was

1   targeted because of his status as a sex offender.  This time, his cellmate extorted him

2   by threatening to kill him and his family members on the streets if he did not comply

3   with certain demands.

4   126.   It took the involvement of the Federal Bureau of Investigation for the extortion to

5   cease and for the victim to be removed from danger.

6   127.   Despite this known risk and demonstrated history of violence against inmate sex

7   offenders across the prison industry—and in their own prison—Defendants Shartle and

8   McClintock did not put any policies or procedures in place to ensure that sex offenders

9   would be protected from the violence perpetrated and, at times, actively encouraged by

10   gang drop-outs and other prisoners who wish to harm sex offenders.

11   128.   For example, under Defendants Shartle and McClintock's leadership, as well as

12   Defendants AW of Custody, the SHU Lieutenant, and the SHU Manager, there was no

13   system in place to ensure sex offenders were housed separately from the gang drop-

14   outs and other prisoners who wished to harm them.  The housing units, including the

15   SHU, at USP-Tucson were mixed.  There was no consistent method or practice in place

16   to ensure that prisoner's placement in the SHU would be with another prisoner who

17   would not abuse him because of his sex-offender status.

18   129.   Under Defendants Shartle and McClintock's leadership, there was no system in

19   place to ensure prisoners' crimes of commitment were kept confidential.  It was not

20   uncommon for BOP officers and staff members to disclose sex offenders' identities as

21

1    such to other prisoners.

2    130.   Many sex offenders have attempted to voice their concerns to Defendants Shartle

3    and McClintock, and other USP-Tucson and BOP leadership, about the obvious risks

4    of violence they face, through the BOP's administrative remedy system.

5    131.   Yet Defendants took no effective, responsive action to protect this population at

6    USP-Tucson.

7    132.   Other non-violent, attempted self-advocacy by sex offender inmates has been met

8    with placement in the SHU.

9    **The Risk of Violence in the SHU at USP-Tucson Was Amplified at The Time of Mr.**

10   **Smith's Murder.**

11   133.   The SHU at USP-Tucson is a housing unit separate from the general population

12   units.  The BOP intends for it to be a unit where prisoners are securely separated from

13   the general population of prisoners.

14   134.   The BOP may assign prisoners to the SHU for two reasons: administrative detention

15   status or disciplinary segregation status.

16   135.   Administrative detention removes a prison from general population when necessary

17   to ensure the safety, security, and orderly operation of the correctional facility, or

18   protect the public.  According to BOP policy, administrative detention status is non-

19   punitive and can occur for a variety of reasons, including at the prisoner's own request

20   or because he is pending classification or re-classification (*e.g.*, he was just transferred

21

1   from another prison and is awaiting his housing assignment).

2   136.   Disciplinary segregation is a punitive status imposed by a Discipline Hearing

3   Officer as a sanction for committing a prohibited act.

4   137.   Upon information and belief, in approximately the last two years, the BOP began

5   sending more gang drop-outs to USP-Tucson than previously.

6   138.   For the reasons explained above, these gang drop-outs do not want to be associated

7   with a sex-offender yard.  To avoid this, when they are transferred to USP-Tucson from

8   another prison they refuse to "join" the yard.  That is, they insist that they remain in the

9   SHU under administrative detention status until the BOP transfers them to another

10   prison.  For some prisoners, this practice may mean months in the SHU.

11   139.   At USP-Tucson, this practice was so widespread among the gang drop-outs in the

12   months leading up to Mr. Smith's murder that the large SHU was often full or nearly

13   full.

14   140.   Cell assignments in the SHU were based on the available space.  As explained

15   above, however, USP-Tucson staff, including the Captain, SHU Lieutenant, SHU

16   Manager, and corrections officers working in the SHU had authority to move prisoners

17   among cells so that no prisoner is forced to share a cell with someone who poses a risk

18   to his safety.

19   141.   Reflecting the widespread knowledge that sex offenders face an obvious and

20   substantial risk of harm from other inmates, SHU officers typically asked prisoners

21

1    whether they would "accept" each other before assigning them to cell with each other.

2    142.    On some occasions, an officer held up a picture of the incoming prisoner and asked

3    whether the prisoner already in the cell would accept him.  On other occasions, officers

4    would escort the incoming prisoner to the cell door and ask both prisoners there whether

5    they would accept each other.

6    143.    On other occasions, officers expressly asked whether a prisoner in the SHU would

7    accept an incoming sex offender, thereby disclosing the incoming prisoner's status as a

8    sex offender.  The fact that officers posed this question also reflected the widespread

9    knowledge among Defendants and USP-Tucson staff that sex offenders face the

10    obvious and substantial risks of harm described herein.

11    144.    If one of the prisoners said no, the officers would typically find another cell to assign

12    to the incoming prisoner.  Often, and due to the high numbers of prisoners in the SHU

13    at USP-Tucson, this required shuffling multiple prisoners between cells to find a

14    suitable—and safe—arrangement.

15    145.    BOP policy also permitted Defendants Shartle and McClintock to arrange for

16    alternative segregation housing if the SHU was too full to house all assigned prisoners.

17    **The BOP Punished Mr. Smith Twice for the Same Offense, Leading to his Placement**

18    **in the SHU.**

19    146.    Weeks before his murder, Mr. Smith incurred a disciplinary charge or a "shot" for

20    violating a prison rule.  The charge was a "300-series" shot, meaning that Mr. Smith's

21

1    punishment was the loss of his phone privileges and a transfer out of the Challenge

2    Program.

3    147.    Mr. Smith's status as a sex offender was apparent on the face of his disciplinary

4    charge. He was accused of having contacted the victim of his offense of conviction.

5    148.    Mr. Smith was devastated to have to leave the Challenge Program, but he accepted

6    responsibility for his mistake and thought that was the last he would hear about the

7    issue.

8    149.    Several days later, however, he was notified that he was receiving a second shot for

9    the same offense.  This time, the charge was a "200-series" shot, which meant that the

10   sanctions would be more serious.

11   150.    Mr. Smith's hearing for the 200-series shot was held the next day before a Discipline

12   Hearing Officer.  He was found guilty and sentenced to disciplinary segregation in the

13   SHU.

14   151.    Upon information and belief, disciplinary segregation is mandatory for prisoners

15   found guilty of a 200-series offense.

16   152.    Upon information and belief, Defendant Captain or SHU Lieutenant prepared an

17   Administrative Detention Order for Mr. Smith, citing the specific reason for (*i.e.*, the

18   disciplinary charge) and evidence in support of Mr. Smith's assignment to the SHU.

19   153.    Upon information and belief, Defendants Shartle, McClintock, AW of Custody, and

20   Captain were notified of all SHU assignments.

21

**The SHU Defendants Knew Mr. Giovanni Would Very Likely Kill Mr. Smith—Because He Told Them He Would.**

154.    On July 4, 2016, Romeo Giovanni was alone in a cell in the SHU at USP-Tucson. Giovanni was reputed to be a drop-out from an Aryan Brotherhood group with aspirations to garner his former gang's respect once again.

155.    In the weeks leading up to his SHU assignment, Mr. Giovanni boasted around the prison compound about having assaulted former cellmates.  He also openly discussed his hatred for sex offenders.

156.    Mr. Giovanni did not hide that hatred while in the SHU.  He repeatedly told BOP staff, including Defendants John Does 5, 6, and 7, not to put a sex offender in his cell.  If they did, he said, he would kill the prisoner Defendants put in the cell with him.

157.    Hours before Mr. Smith's arrival, Defendants John Doe 5, 6, and 7 escorted another sex offender to the SHU.  These Defendants asked Mr. Giovanni whether he would accept that prisoner in his cell.  Mr. Giovanni reiterated what he had told these Defendants previously—that he would kill any sex offender with who he was forced to share a cell—so Defendants found another cell to assign to that incoming prisoner.

158.    As the day progressed, the SHU continued to fill up. The available cells for incoming prisoners dwindled.  And it was July 4th, the Monday of a long holiday weekend.

159.    Upon information and belief, Defendants AW of Custody, Captain, SHU

Lieutenant, and SHU Manager knew the capacity status of the SHU, as well as the status of incoming prisoners to the SHU.

160.    Upon information and belief, the SHU was short-staffed due to the holiday weekend.

161.    Sometime after lunch, in the mid-afternoon, Defendants John Does 5, 6, and 7 brought Mr. Smith to the SHU.

162.    Defendants John Doe 5, 6, and 7 escorted a handcuffed Mr. Smith down the tier of the SHU at USP-Tucson.  They approached the cell of Mr. Smith's soon-to-be assailant and asked if he would "accept" Mr. Smith as his cellmate.

163.    Again, Mr. Giovanni, the prisoner in that cell, loudly refused.  He told John Does 5, 6, and 7 that he would kill Mr. Smith if they put the two in a cell together.

164.    Mr. Smith knew that there was good reason to take Mr. Giovanni's threats seriously. He pleaded with Does 5, 6, and 7 to find another cell for him.

165.    Notwithstanding this dynamic between Mr. Giovanni and Mr. Smith, and Mr. Giovanni's earlier threats towards sex offenders, Defendants John Does 5, 6, and 7 placed Mr. Smith in the small cell with Mr. Giovanni, locked the door, and walked away.

166.    The next morning, Mr. Smith was dead.

167.    The murder that had occurred overnight, however, was not apparent to anyone but Mr. Giovanni until many hours into the next day.

168.   Throughout the night and following morning, no officer, including Defendants John Doe 1 through 7, even looked in Mr. Smith's and Mr. Giovanni's cell, let alone conducted rounds or checked on Mr. Smith.

169.   Mr. Smith's death went unnoticed during breakfast rounds.

170.   Prior to Mr. Smith's murder, no officer, including Defendants John Doe 1 through 7, attempted to shuffle cell assignments to find a suitable and safe arrangement for Mr. Smith after Mr. Giovanni told them he would kill Mr. Smith.

171.   Shortly after breakfast the next morning, Mr. Giovanni began yelling from his cell to other prisoners in the SHU, accusing Mr. Smith of being a "sick bastard" and asking the rest of the tier whether they knew "what he had done," referring to Mr. Smith's underlying criminal conviction.

172.   Several of the other prisoners in the SHU responded to Mr. Giovanni, indicating they believed he was a sex offender.  They yelled, "We've got a couple of them down here," presumably referring to other sex offenders in the SHU whom they believed should have been the next targets.

173.   This continued for several hours.

174.   Mr. Giovanni then started yelling about the odor in his cell, claiming, "This guy is starting to stink.  I'm going to have to hit the [panic] button.  I think the sick bastard shit himself," and making retching noises.

175.   Upon information and belief, Mr. Giovanni then pressed the distress button in his

cell.  SHU officers arrived soon thereafter and only then discovered Mr. Smith's body in the cell with Mr. Giovanni.

176.   The officers called for medical support but it was far too late.

177.   According to an autopsy done later, Mr. Smith was asphyxiated.  Upon information and belief, Mr. Giovanni strangled Mr. Smith with a piece of a bed sheet.

178.   The officers cuffed Mr. Giovanni and escorted him from the cell.  The officers did not cover the windows in the cell doors of the prisoners in the SHU, so they were able to see all the activity on the range.  As Mr. Giovanni walked out of the SHU, other prisoners applauded and cheered.

179.   The officers and medical team then transported Mr. Smith's body from the cell on a stretcher.  No BOP official had covered the cell door windows, and, thus, the prisoners in the SHU—including several sex offenders—saw Mr. Smith's corpse paraded by them.

180.   BOP policy required Mr. Smith's living conditions in the SHU to "meet or exceed" health and humane treatment.

181.   BOP policy also required Defendants SHU Lieutenant and John Does 5, 6, and 7 to directly monitor the prisoners in the SHU and to ensure all procedures are followed. None of them ensured the procedures for housing Mr. Smith in a safe environment were followed, nor did they monitor Mr. Smith's condition in the hours leading up to his murder.

182.    Mr. Giovanni was charged in this Court with the murder of Mr. Smith.  His criminal case is pending.

**Mrs. Smith Learns of Her Husband's Death.**

183.    The afternoon of July 5, 2016, a BOP chaplain called Mrs. Smith to tell her that her husband had died that day.  He did not provide any details—including the fact that he was murdered—but directed Mrs. Smith to a woman at the BOP who would, according to the chaplain, provide more information and answer her questions.

184.    Mrs. Smith reached out to the woman but she was rude and evasive.  She did not answer the many questions running through Mrs. Smith's mind as Mrs. Smith tried to process the news of her husband's death.

185.    For the next week or so, Mrs. Smith and other members of Mr. Smith's family continued to try to get information about Mr. Smith from the BOP.  No one would give them information about Mr. Smith's death.

186.    It took four days for the coroner to complete the autopsy of Mr. Smith's body.  The final report identifies his cause of death as asphyxia due to ligature strangulation.  The manner of death was homicide.

187.    The BOP then arranged for Mr. Smith's body to be transported back to Louisiana.  He did not arrive there until July 14, nine days after his death.  Mrs. Smith still did not have any further information from the BOP as to how he had died.

188.    No one informed Mrs. Smith that her husband had been murdered until July 15—

1    ten days after his death.

2    189.   Mr. Smith's funeral was held on July 19, 2016, at the Saint Amant Baptist Church—

3    the same church where he and Mrs. Smith had gotten married nearly seventeen years

4    earlier and where the Smith family attended church and school.

5    190.   Almost fifty people from the small community came to support the Smith family

6    and say goodbye to Mr. Smith.

7    191.   Meanwhile, at USP-Tucson, Defendants Shartle and McClintock and their staff

8    were trying to keep Mr. Smith's murder quiet.  They did not inform the prisoners who

9    lived with Mr. Smith and knew him as a friend of what had happened, and they resisted

10    holding any sort of service to remember Mr. Smith.

11    192.   But Mr. Smith's friends and community at USP-Tucson were mourning.  At the

12    insistence of several USP-Tucson prisoners, there was eventually a memorial service

13    held for Mr. Smith.  His fellow prisoners, most of whom were his colleagues in the

14    Challenge Program, organized the service with the support of the prison chapel.

15    193.   The prison service was packed.  More than one hundred people attended.  People

16    shared their favorite memories of Mr. Smith, and his fellow musicians performed in his

17    honor.

18    **Mr. Smith Was Not Sentenced to Death at the Hands of Another Prisoner.**

19    194.   Mr. Smith was convicted of a crime, and he was peacefully serving the time for

20    which he was sentenced.  He was doing his best in prison to better himself, to make

21

1    friends, and to correct the mistakes he had made in his life.

2    195.    Mr. Smith's lawful sentence was a term of years in the custody of the BOP; it did

3        not include the abuse and violence to which he became victim.

4    196.    If not for Defendants' blatant and conscious disregard of Mr. Smith's safety—and

5        of his humanity—it is likely that he would still be alive today.

6    197.    Mrs. Smith still carries the strength that Mr. Smith's persevering love helped her

7        cultivate.  But she has been left alone to care for their beautiful but high-needs family

8        without his support.  And Mrs. Smith is forced to live every single day without the love

9        and companionship that she shared with Mr. Smith.



*Mrs. Smith at Mr. Smith's gravesite near their Louisiana home.*

**CLAIM ONE**

**EIGHTH AMENDMENT VIOLATION – FAILURE TO PROTECT**

(Against all Defendants)

198.   Plaintiffs incorporate all previous allegations as set forth herein.

199.   Prison safety, including the safety of all prisoners, should be a primary concern of all prison employees and staff members.

200.   Prison officials are constitutionally and statutorily obligated to take reasonable measures to guarantee prisoners' safety.  Prison officials are also obligated under 18 U.S.C. § 4042 to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection…of all persons" under their care.  These obligations include protecting prisoners from violence at the hands of other prisoners.

201.   Mr. Smith faced a substantial risk of serious harm when he was locked in the same cell as Mr. Giovanni, a violent prisoner who had told the SHU Officers he would kill Mr. Smith if they were forced to cell together.

202.   Defendants were aware that locking Mr. Smith in a cell with Mr. Giovanni presented a substantial risk of serious harm to Mr. Smith.

203.   Defendants consciously disregarded the substantial risk of serious harm to Mr. Smith.

204.   Defendants' actions or omissions were the actual and proximate cause of Mr. Smith's injuries and death.

**CLAIM TWO**

**FIFTH AMENDMENT VIOLATION – DENIAL OF COMPANIONSHIP AND**

**FAMILIAL ASSOCIATION**

(Against all Defendants)

205.    Plaintiffs incorporate all previous allegations as set forth herein.

206.    The Fifth Amendment's due-process guarantee includes the right of spousal association, companionship, and support.

207.    Defendants' failure to protect Mr. Smith from the obvious risk of substantial harm he faced, which ultimately led to his death, deprived Mrs. Smith of her right to her husband's association, companionship, and support.

208.    Defendants' actions or omissions were the actual and proximate cause of Mrs. Smith's injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request respectfully that the Court enter judgment in their favor and against Defendants, and grant:

a.   Appropriate relief at law and equity;

b.   Declaratory relief and other appropriate equitable relief;

c.   Economic losses on all claims allowed by law;

d.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

e.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

f.  Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

g.  Pre- and post-judgment interest at the highest lawful rate; and

h.  Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 2nd day of July, 2018.

JOHNSON & KLEIN, PLLC

_s/ Gail K. Johnson_

Gail K. Johnson

Aurora L. Randolph

Attorneys for Plaintiffs Estate of

Clinton Dewayne Smith, Sabrina Smith